**HUFF v. HUFF et al.**

**No. 1270.**

Court of Civil Appeals of Texas. Eastland.

May 11, 1934.

Rehearing Denied June 8, 1934.

Callaway & Reese, of Comanche, and Gib Callaway, of Brownwood, for appellant.

George E. Smith, of Comanche, for appellees.

HICKMAN, Chief Justice.

This is the second appeal of this case; our opinion on the former appeal being reported in 52 S.W.(2d) 1092. The suit involves a contest over the probate of the will of Mrs. T. C. Huff, by which she left her estate to some of her children to the exclusion of others. Two fact issues were submitted to the jury as follows: First, "Do you find from the evidence that at the time Mrs. T. C. Huff executed the will in question she had testamentary capacity, as that term is hereinbefore explained?" To which the jury answered "No." Second, "Do you find from a preponderance of the evidence that Mrs. T. C. Huff was caused to execute the will in question by reason of undue influence (as that term is hereinbefore explained) exerted upon her by J. H. Huff, Mrs. R. H. Denny and George D. Huff, or either of them, either preceding or at the time of the preparation and execution of said will?" To which the jury answered "Yes." Upon this verdict judgment was rendered denying the application to probate the will.

Three questions are presented in appellant's brief, which will be considered in their order.

The first question relates to the admissibility of certain evidence, and arose in the following manner: Dr. A. J. Gray, who had been the family physician of the testatrix for many years during her lifetime, was an important witness for appellant, the proponent of the will. His testimony was to the effect that testatrix was of sound mind. On cross-examination he was asked whether or not, in a conversation with appellee W. T. Huff on the north side of the courthouse in the town of Comanche, out of the presence of the testatrix, he had made the statement that the mind of the testatrix was about like that of an 8 year old child, to which he replied that he had no recollection of such conversation. Thereafter appellee W. T. Huff was permitted by the court, over appellant's objection, to testify, "Yes, Dr. Gray made the statement to me on the north side of the courthouse after he had been to see my mother that her mind was about like an eight year old child's." The objections to the testimony were (1) that it was purely hearsay; and (2) that it was an indirect way of permitting the contestant W. T. Huff to testify as to the con-

'dition of his mother's mind, which was forbidden by the statute, article 3716, R. S. 1925. It is apparent, we think, that the evidence was not subject to the objection that same was hearsay. It was positive testimony by the witness to a fact claimed 'to be within his knowledge. Neither do we think the evidence was subject to the objection that same was forbidden by article 3716. That statute denies to this witness the right to testify "as to any transaction with, or statement by the testator * * * unless called to testify thereto by the opposite party." A clear statement of the applicable test in determining whether evidence comes within the inhibition of this statute is made by our Supreme Court in Holland v. Nimitz, 111 Tex. 419, 425, 232 S. W. 298, 299, 239 S. W. 185, in this language: "The object of the statute was to prohibit the interested heirs and legal representatives from testifying to any facts, or opinions, based upon observations, arising out of any transaction with the decedent which the decedent could, if living, contradict or explain. Death having sealed the lips of one of the parties, the law, for reasons founded upon public policy, seals the lips of the other."

In the case of International Travelers' Ass'n v. Bettis (Tex. Civ. App.) 3 S.W.(2d) 478, 480, reversed on other grounds in 120 Tex. 67, 35 S.W.(2d) 1040, the opinion quotes with approval this statement of the rule taken from the opinion in Van Wagenen v. Bonnot, 74 N. J. Eq. 843, 70 A. 143, 18 L. R. A. (N. S.) 400: "The test laid down in our decisions in ascertaining what is a 'transaction with' the deceased about which the other party to it cannot testify is to inquire whether, in case the witness testify falsely, the deceased, if living, could contradict it of his own knowledge."

Applying that test to the evidence complained of in the instant case, the inquiry becomes: Could the testatrix, had she been living, have explained or contradicted this testimony? It is obvious that she could not have done so. The testimony was as to a statement made by Dr. Gray to the witness, not in the presence or within the hearing of the testatrix. She could not, of her own knowledge, have denied that Dr. Gray made that statement, nor could she, of her own knowledge, have explained same. It follows, we think, that the evidence was clearly admissible, and assignment No. 1 is overruled.

Assignments Nos. 2 and 4 in effect present the same question, the former assigning error of the court in submitting to the jury any issue of undue influence, and the latter assigning error of the court in not setting aside the answer of the jury to the issue on undue influence, because same was wholly without any support whatsoever in the evidence. We find it unnecessary to discuss this question. There is no assignment challenging the finding of the jury on the issue of mental incapacity. If the answer of the jury to the issue on undue influence should be set aside as being unsupported, there would still remain support in the verdict for the judgment rendered. We shall therefore not detail the evidence on this question, but we do hold that there was probative evidence of undue influence, and overrule assignments 2 and 4.

The third assignment presents that the court erred in refusing to set aside the verdict of the jury and judgment rendered thereon and grant appellant a new trial, because he did not receive a fair trial before an impartial jury. In his amended motion for a new trial, appellant charged that Cari Roberts, one of the jurors who sat in the case, was not an impartial juror, and requested the court to hear evidence touching the matter. The request was granted and the facts fully developed. Upon the hearing, Claude Harris testified that two or three weeks before the trial of this case he had a conversation with the juror in the presence of Irvin Gore and Barney Hunter. The portions of the testimony of this witness copied in the brief of appellant, and which are therefore deemed to be the most material parts thereof, are as follows:

"He went on and said Mr. Will Huff had helped Henry out of lots of trouble, and helped put him in business here and you could see that Henry was not doing him right, and was trying to beat Will out of his part of the estate, and that they ought to have divided it equal, and he said Grandma Huff ought not to have made the will.

"Well he said that Henry had got in trouble down on Indian Creek with a girl and old man Huff didn't have any money at the time and Will had spent lots of money with the Callaway boys to get him out and that Will had helped Henry go in the jewelry business over here at Resse's, I think he said about two thousand dollars. He said the old man didn't have the money at the time and Will furnished it. He said Will furnished about two thousand dollars at the time to get Henry out. * * *

"He said Henry drugged a girl over there on Indian Creek and ruined her, and ran away from this country, and Will Huff spent lots of money with the Callaway boys to get him out of it."

The portions of the testimony of Irvin Gore copied in appellant's brief are as follows:

"Well we were talking. Mr. Harris and Mr. Roberts were doing most of the talking. Mr. Roberts (the juror) said he could make a better witness for Mr. Will then he could for Henry, on account he sold Mr. Huff some mules before he died and he said Mrs. Huff seemed like she got wrought up about it, and he offered to give him the check back and he told him he thought the mules was worth the money. * * *

"He said that Henry got into trouble about a girl, and ruined her and he run off and stayed several years and said Mr. Will Huff helped him get out of it, that he furnished him money. He said the property ought to be divided equally."

We copy from appellant's brief the statement of the other evidence offered by him, as follows:

"J. H. Huff, the proponent, testified on the said hearing that he did not know that the witness Carl Roberts had made any such statements at the time the jury were selected, and if he had known it he would have challenged the juror; Gib Callaway, one of the attorneys for the proponent, who examined the jurors on the voir dire examination, stated that he asked the juror Roberts if he had any bias or prejudice against any of the parties to the suit, or had any opinion as to which should win, and he stated that he did not. Also, if he had ever formed or expressed any opinion as to the merits of the case and he stated he had not, and that he knew nothing of the statements made by the juror as testified to by Harris and Gore, and that if he had he would have challenged said juror for cause, or would have exercised a peremptory challenge upon him."

Appellees called the juror to the witness stand, and he testified as follows:

"Mr. Callaway asked me, was I raised down there among those boys. I told him I was. He said, 'Would you give them a fair and impartial trial?' I told him I would. I asked that they let me off, asked him to excuse me, but they went on and took me. I would say he asked me about five questions. As far as asking me if I had an opinion, he didn't ask me that. He asked if I would give him a fair trial, and I told him I would do my best. I told him my father's land adjoined there, and asked him to excuse me on that ground. No, he did not ask me if I had formed an opinion. He didn't ask me whether I had expressed an opinion. To the best of my knowledge I surely did answer the questions Mr. Callaway asked me truthfully.

"Q. I will ask you whether or not you were prejudiced or influenced against Mr. Henry Huff by any information or knowledge that you had about Henry or his family, or any feeling before you went into the jury box, or did any of the knowledge you had of the history of the family have anything to do with your deliberations as a juror in this case? A. No, not a bit on earth. As to my knowledge of the trouble Henry had 26 years ago, it was just a general talk. * * * My friendship with Henry continued on down the years, right up until the present day, so far as I knew. He went with me when I carried my father to the sanitarium. It is not true, as alleged there, that I was prejudiced against Henry in this will business. I felt, when I went into the jury box, just as much toward Henry as the rest, and just as much toward George as the rest. When I was being examined as a juror in this case, I did not have any fixed opinion in my mind as to who was right or wrong in the case. * * * My stepmother was a witness for Henry. But I never discussed the case with them, and didn't know anything about it much except just hearsay. At the time I had this conversation with Harris and the others, I did not at that time give it as my opinion that either side should win. I only said I thought my children should have what each one was supposed to get. I never said anything at all about the other. I did not say anything about how Mrs. Huff should divide her property. I made no reference about that at all."

As to the facts regarding the conversation with Harris and Gore, the juror was corroborated in the main by Barney Hunter, who was present. Clay Frost, a juror in the same case, testified on the hearing of the motion that there were no disagreements in the jury room, but that the jury unanimously arrived at the answers to the two issues within a short time. No improper conduct in the jury room was alleged or testified to. Upon a consideration of all the testimony, the court below decided that the allegations of appellant's motion had not been sustained, and accordingly refused to grant a new trial.

We have given careful consideration to all the authorities cited and the testimony offered in support of this motion, and have concluded that we would not be warranted in holding, as a matter of law, that the juror was disqualified because of his bias in favor of, or prejudice against, either party. The

question is not whether the testimony would support a finding of prejudice on the part of the juror, but whether it so conclusively establishes its existence that we would be authorized to hold, as a matter of law and contrary to the finding of the trial court, that the juror was disqualified. The facts show that the juror was very friendly to all parties, and that appellant knew of the juror's knowledge of his past troubles. The juror sought to be excused from serving in the case, but each litigant, knowing that he was well acquainted with all parties, was willing to trust his judgment. Much latitude must be accorded the trial judge in passing upon a question of this nature. The issue presented is one of fact, not one of the effect of established disqualification. We cannot say that the issue was improperly determined by the trial judge or that he abused his discretion. The assignment will, therefore, be overruled. Texas Employers' Ins. Co. v. Chocolate Shop (Tex. Com. App.) 44 S.W.(2d) 989; Monkey Grip Rubber Co. v. Walton, 122 Tex. 185, 53 S.W.(2d) 770. Estep v. Bratton (Tex. Civ. App.) 24 S.W.(2d) 465; Texas & Pacific Ry. Co. v. Foster (Tex. Civ. App.) 58 S.W.(2d) 557.

Having considered and overruled all of the assignments, it follows that the judgment of the trial court should be affirmed, and it is accordingly so ordered.